Matter of Sarah S. (2005 NY Slip Op 51464(U))

[*1]

Matter of Sarah S.

2005 NY Slip Op 51464(U)

Decided on September 15, 2005

Family Court, Monroe County

O'Connor, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 15, 2005

Family Court, Monroe County
In the Matter of Sarah S., A Child under the Age of Eighteen Years Alleged to be Neglected by Carey S. and Edgar S., Respondents.
NN 003231-00/05E

Charles O. Baisch, Esq., Deputy County Attorney, for DHS
Christine Redfield, Esq., Assistant Public Defender, for Carey S.
Tynise Edwards, Esq., Assistant Conflict Defender, for Edgar S.
Mark D. Funk, Esq., Law Guardian

Marilyn L. O'Connor, J.
DECISION In June, 2005 Monroe County Department of Human Services filed a proposed Order to Show Cause with supporting papers under Family Court Act, Article 10, requesting a modification of the placement of Sarah (DOB 1998), who had originally been adjudicated a neglected child by order made in February, 2001. The Department sought to move the child from the care and custody of Evelyn A. ("Ms. A."), a cousin of the child's mother, to the care and custody of the Monroe County Division of Social Services (DSS), i.e., foster care. The original neglect order had been extended several times, and through the Order to Show Cause signed in June, 2005, the placement of the child with DSS was approved on an interim basis pending determination of the modification proceeding. The matter could not be settled and went to a hearing. The Department indicated it started this modification proceeding in great part because the relative resource, Ms. A., had asked for the child to be moved. However, throughout the modification proceedings Ms. A. denied that she had ever asked for Sarah to be removed from her care and by the time of trial she had filed for custody. At the time of the trial, the respondent mother wanted the child to remain with her cousin, Ms. A. The respondent father opposed the [*2]child being in foster care, arguing the Department had not done everything it could do to find an alternative, non-foster care placement. There was no evidence at any time that an alternative relative resource had been proposed for placement of the seven-year-old girl.
APPLICABLE LEGAL STANDARD
A question arose as to the applicable test which must be met in order to justify moving the child from her relative resource home and placing her in the custody and care of DSS. The Family Court Act does not provide specific guidance in this regard. The purpose of Article 10, set forth in section 1011 of the Family Court Act, is as follows:
This article is designed to establish procedures to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being. It is designed to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met.
Furthermore, as set forth in section 1061 of the Family Court Act, "For good cause shown and after due notice, the court. . . on motion . . .may. . . modify or vacate any order issued in the course of a proceeding under this article." On the issue of the legal standard, the Department argued that it did not need to establish imminent risk (as needed for a removal of a child from the home of parents or legal guardians), but only that the proposed move to foster care is in the child's best interests. The attorney for respondent mother argued that this was essentially a removal hearing, and that the Department had a statutory obligation to exercise reasonable efforts to prevent a removal from Ms. A. which it had not met. She also argued that the best interests of the child were served by leaving Sarah with her relatives and not putting her in foster care. The respondent father's attorney offered no specific position on the applicable legal standard. The law guardian, who had not yet spoken with his client, did not take any position. After closing arguments, all parties were given the opportunity to submit written legal arguments, but no one did so. The law guardian did however submit a post-trial letter after consulting with Sarah. He then supported leaving Sarah in the specific foster care home in which she had been placed pursuant to the interim relief granted by the Order to Show Cause. For the reasons discussed below, the court concludes that the article 10 modification proceeding seeking to remove Sarah from a relative resource is governed by custody principles.
While no case law could be found which is directly on point, i.e., involving the potential transfer of a child from a relative resource to foster care, the Fourth Department has determined that article 10 proceedings are in their essence custody proceedings. Accordingly, it has applied the usual change of custody principles to them. From the Fourth Department's decisions it can be extrapolated that one must allege a significant change of circumstances in order to be entitled to a hearing to determine the best interests of the child arguably needing a new placement. If a substantial change of circumstances is established at the hearing, the best interests question can also be reached. In Matter of Michael W. (120 AD2d 87 [4th Dept. 1986]), as in a typical change of custody proceeding, the petition filed for a modification alleged a "change of circumstances" though in contrast to a typical change of custody petition, the petitioner was the Department of Social Services. In Matter of Michael W., the DSS alleged the child should be returned to his father because he had done what he needed to do to be an adequate father. The [*3]foster parents, who had had the child for more than 12 months in a pre-adoptive placement, sought to intervene. The Fourth Department explained in Matter of Michael W. (supra, p 91):
Although the aim of an article 10 proceeding is the opposite of a permanent neglect proceeding, i.e., the goal in a child protective proceeding is to reunite the family if possible, not to free the child for adoption, the decision to place the child in foster care expands the child protective proceeding into one which thereafter involves the custody of the child. . . . .n1
* * * * *
n1 Any remaining doubt as to whether a placement under section 1055 is a proceeding involving custody is dispelled by reference to the statute. Section 1055 (a) authorizes the court to "place the child in the custody of * * * the commissioner of social services" (emphasis supplied). Under this language it is clear that placement is a proceeding involving "custody".

The Fourth Department, citing Social Services Law, section 383(3), and Family Court Act, section 1055, held the foster parents had a right to participate regarding "the modification petition to return custody of the child to the father". The court specifically noted in Michael W. (supra, p 89) that, "A motion to modify or vacate any order issued in a child protective proceeding may be made '[for] good cause shown' (Family Ct Act § 1061)." It seems clear that "good cause shown" would mean a "change of circumstances" to the Fourth Department.
Another Fourth Department case, Matter of Chauncey W. (185 AD2d 675 [4th Dept. 1992]), continued the use of custody principles in an article 10 context, specifically explaining that the "best interests" of a child is determinative when the question before the court is whether custody of a neglected child should be transferred to another placement. In affirming the Family Court's decision to transfer custody of a child adjudicated to have been neglected to her brother and sister-in-law in Maryland, the Fourth Department ruled the transfer was not an "abuse of discretion." "Abuse of discretion" is of course the standard of review on appeal for custody cases. (E.g., Lamirande v Lamirande, 251 AD2d 1071 [4th Dept. 1998]).
The Fourth Department's 1986 case, Matter of Belinda B. (114 AD2d 70), also emphasized the critical nature of best interests determinations in neglect cases generally by applying the best interest test to extensions before the statute was amended in the 1990's to state that rule explicitly. (Family Ct Act § 1055[b][iv][B] now provides expressly that extensions of placement are to be "consistent with the best interests of the child".)[FN1] Belinda B. noted that the Family Court Act did not then define standards for determining whether foster care placement should be extended. Instead, it simply authorized the court to make successive extensions "in its discretion" (Family Ct Act § 1055[b]). That being the case, the court concluded, "Under Bennett [FN2] the best interests of the children should be considered before they are returned to their natural parents", and significantly, that even when natural parents are proved fit, "they may not [*4]be entitled to the immediate return of their children without first considering the best interests of the children."
From the above Fourth Department case law it must be concluded that the Fourth Department here would hold that even if a relative resource is "fit", that does not mean the relative resource is entitled to keep the child if there has been a change of circumstances justifying reconsideration of the original placement. In the case of a change of circumstances, the best interests of the child, as determined from a hearing, could indicate the child should be moved.
 The First Department case, Matter of Dominick S. (289 AD2d 11 [1st Dept 2001]) supports the Fourth Department's conclusion that a child's "best interest" is critical when a transfer of a child is sought in an Article 10 case. In Matter of Dominick S. (supra) the First Department reversed a transfer of an allegedly neglected child from one relative to another, saying:
As the child was already in a kinship placement with his great-grandmother, the need for the hearing conducted by Family Court to determine whether the child's grandmother was a more suitable kinship resource is unclear. (Emphasis in original.) Family Court Act § 1017 (2) (a) (i) confers the authority to "conduct such other and further investigations as the court deems necessary" in determining the suitability of relatives of the child as custodians (see, Matter of W. Children, 167 AD2d 478, lv denied 78 NY2d 854). Where a determination has been made as to placement, however, the provision affords no basis upon which to reopen the matter and, absent some material change in circumstances warranting reassessment (emphasis added), the determination should remain [the] law of the case (Family Ct Act § 1017 [3]).

This case clearly indicates a "change of circumstances" will justify a new hearing on placement. The First Department in Dominick S. (supra) concluded there was "no need to disturb the Family Court's original decision that it would be in the best interests of the child to reside with his great-grandmother pending the determination" in the underlying neglect and abuse case. (Emphasis added.)
THE FACTS CHANGE OF CIRCUMSTANCES After an examination of the testimony and documentary evidence in the case at bar, it must be concluded that Ms. A. did in fact ask for Sarah to be moved to another home, but thereafter changed her mind and wanted her to stay. The credible evidence shows that on or about April 11, 2005, Ms. A. called caseworker Beverly Ford, and left her a voice mail indicating she wanted to talk about giving up "custody rights with Sarah." The routinely kept "Progress Notes Cover Sheet", identified by Judith Jones, senior caseworker, has an entry on April 11, 2005, stating:
8:26 am V[oice] M[ail] fr[om] Evelyn A., Sarah's [sic] S.'s Caretaker/Aunt 266-7014 Wanting to talk about giving up custody rights with Sarah. Thought this was temporary, but no improvement and not returning to mother.
The notes also reflect a follow-up call made by the caseworker 8 days later on April 19, 2005, in which Ms. A. again asked for Sarah to be moved. There it was written in part:
[*5]Ret[urn] P[hone]C[all] to Evelyn. No answer at home No.[omitted] PC to Cell #[omitted]. Evelyn said she was getting frustrated with the whole situation of Carey doing nothing to get Sarah back or to visit or call her. . . that it's been 4 years (actually just Dec 02 to Apr 05) and it's going nowhere. . . and that it's become very stressful for her and her family because Sarah's behaviors have gotten much worse. She really would like Sarah to be placed elsewhere.
* * * * *
 Judith Jones ("Ms. Jones") testified that she went to see the respondent mother, Ms. S., and among other things, Ms. S. told Ms. Jones that she was upset that Ms. A. had asked to have the child removed. Furthermore, Ms. Jones testified Ms. S. told her that she, Sarah's mother, was concerned about Sarah being in Ms. A.'s home, and that as Sarah's mother she wanted time to identify another relative to take care of Sarah. Ms. Jones testified that the case worker assigned to the case, Beverly Ford ("Ms. Ford"), had spoken with relatives who had siblings of Sarah, and they were not willing to take Sarah. She also spoke with a potential foster care mother of one sibling, and she, too, would not take Sarah.
Having obviously changed her mind regarding keeping Sarah, Ms. A. herself ultimately nonetheless testified and admitted that she had talked to the caseworker, Ms. Ford, and revealed to her that she was very concerned about Sarah's behavior, and that she was getting out of control. However, she testified she had wanted options, not removal. Still, she admits Ms. Ford said she would look for another family member to care for Sarah. In the face of the above business records, the limited admissions made by Ms. A., and the follow-up efforts by the Department to find Sarah a new home and to begin this litigation, Ms. A.'s denial that she had called and asked for Sarah to be removed is not credible. This lack of credibility undermines the credibility of her entire testimony. Ms. A.'s serious request that Sarah be moved to another home, for the stated reasons, created a change of circumstances justifying a best interests determination.
THE FACTS BEST INTERESTS
The evidence establishes that it is in Sarah's best interests to be in foster care, particularly when she is happier in her foster care home than at home with Ms. A., as indicated by her law guardian. Ms. Jones testified to speaking twice with Sarah. Like Ms. A., Sarah appears to have changed her mind about what she wanted. At first she was "very open". She told Ms. Jones that she did not get along with her cousins and they fought. The second time, Ms. Jones described Sarah as "answering very guardedly" when Ms. Jones conversed with her at school. Sarah would not look at her, and put her hands up so that Ms. Jones could not see her face. Ms. Jones had asked Sarah if she had visited her mother without court-ordered supervision, but was unable to confirm previous secondhand statements (reportedly made to her teacher and her school counselor) indicating that Sarah had recently been in the care of her mother without an approved supervisor present. The description of Sarah's behavior when responding to Ms. Jones's questions very likely indicates a child who is struggling to misrepresent the facts. Additionally, Ms. Jones testified that when she made a surprise visit at the home of Sarah's mother, in part to see if Sarah was there unsupervised as reported, Ms. S. refused to let her enter. Ms. S. admitted she refused entry to Ms. Jones, and Ms. S. further admitted she had no reason not to let her in. This forces the court to infer and conclude that Sarah was then present in violation of the order [*6]requiring supervised visitation, or that incriminating evidence of her presence there in the recent past would have been uncovered.
 Ms. Jones further testified that when Sarah was moved to foster care by temporary order, Ms. A. provided very little clothing for Sarah specifically, a nightgown, skirt, pair of underwear and a shirt. Additionally, she testified that the clothes looked dingy to her and that the foster care mother threw the clothes out because they were "moldy". This testimony was credible. When Ms. A. testified about clothing, she indicated she bought Sarah clothes every couple months and received adequate money monthly to pay for clothing. Ms. A. admitted receiving more than $400 per month for Sarah's care. Similarly, there was a Child Protective Services referral regarding Sarah having dirty clothes, and while the charge was "unfounded" for lack of imminent risk, the report noted a legitimate concern existed regarding Sarah's clothing being dirty. Ms. A. blamed the referral on boyfriend problems, but that could not undo the concern duly noted about dirty clothing. Furthermore, when testifying in response to concerns that she sent Sarah to school in dirty and ill-fitting clothes, she first denied the problem. She claimed to have laid Sarah's clothes out in the morning and to have checked Sarah and the other children before they left for school.
On cross-examination, however, she had to admit that she did not even watch the children go off to school, but left the supervision of the children before school to her mother. She also said children wear "whatever they want". Again, Ms. A. proved herself not to be credible. Furthermore, she admitted on cross-examination that the teacher discussed concerns about Sarah's clothes and hair being dirty, and that a clothing voucher was suggested for Sarah's benefit. It must be concluded that Ms. A. did have adequate money for adequate clothes for Sarah, but did not provide them. Dressing her poorly and providing only a little, moldy clothing for her move was unconscionable and neglectful, and not in Sarah's best interests.
There were also several health related problems which went unaddressed or under-addressed while Sarah lived with Ms. A. and support a change of custody in Sarah's best interests. Sarah's counseling did not get started in a timely fashion. According to the evidence, it was to have started in October of 2004 and had not started by the time of the trial in July of 2005. Ms. Jones testified that the chosen counselor had called the respondent in the spring to urge her to make an appointment. According to Ms. Jones, Ms. A. admitted she had even canceled the first scheduled appointment in June due to a field trip. Ms. A. testified herself that she had played phone tag with the counselor for a while, and then did not return a call after that as she did not feel Sarah needed the counseling then. While some delay is understandable, it was Ms. A.'s duty as the care giver for Sarah to make certain that appropriate counseling was in place. It is not adequate to simply blame the school for not providing it in a timely fashion, as Ms. A. did according to Ms. Jones. It was not in Sarah's best interests to refuse to arrange counseling for a child who obviously at the very least had the serious problem of being a neglected child, not living with either parent, and who additionally was on medication due to behavior issues.
Ms. Jones also testified that Sarah missed an eye appointment for lazy eyea problem which was getting worse, was overdue for her physical, and let Sarah's Ritalin supply run out for a few days at a time, resulting in uncontrollable behavior. Ms. A. admitted Sarah had been out of medicine, but claimed it was for no longer than one day. Obviously, even one day is one day too many, and Ms. A.'s efforts regarding Sarah's health care needs have been inadequate.
Finally, it must be noted that Ms. S.'s testimony as Sarah's mother was generally no more [*7]credible or helpful than Ms. A.'s. She wanted Sarah to remain with Ms. A. She unreasonably denied having any concerns about her daughter's care. She should have had at least some concerns about her daughter's care and treatment, given the evidence, but she did not. While the court can appreciate a desire to keep children out of foster care, that goal does not justify a failure to testify truthfully or to support what is in her daughter's best interests which is removal from Ms. A.
The court finds that facts sufficient to sustain the petition are established. There has been a change of circumstances with respect to Sarah's custody in that her caretaker, Ms. A., asked for her to be removed from her care, and Ms. A. generally failed to take adequate care of Sarah, as set forth above. Accordingly, it is in the best interests of Sarah that she be placed in foster care for a period of up to one year from the date hereof, preferably in the home where she has resided on a temporary basis.
Submit order.
 DATED: September15, 2005_____________________________
Rochester, NYHON. MARILYN L. O'CONNOR,
FAMILY COURT JUDGE
NOTICE: Pursuant to section 1113 of the Family Court Act, an appeal must be taken within thirty days of receipt of the order by appellant in court, thirty-five days from the mailing of the order to the appellant by the clerk of the court, or thirty days after service by a party or law guardian upon the appellant, whichever is earliest.
MAILED OR HAND-DELIVERED: Charles O. Baisch, Esq., Christine Redfield, Esq., Tynise Edwards, Esq., Mark D. Funk, Esq.

Footnotes

Footnote 1: Cf. Family Ct Act § 1055-a[7], which also requires dispositions in periodic permanency hearing proceedings for children freed for adoption to be made "in accordance with the best interest of the child".

Footnote 2: Matter of Bennett v Jeffreys, 40 NY2d 543, 549.